**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 9 1997**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

PEGGY J. BRIDGES,

        Plaintiff-Appellant,

v.

FARMERS INSURANCE GROUP OF
COMPANIES, an unincorporated
association; FARMERS INSURANCE
COMPANY, INC.; FARMERS
INSURANCE EXCHANGE;
FARMERS GROUP, INC., foreign
insurance corporations,

        Defendants-Appellees.

No. 95-6317
(W. District of Oklahoma)
(D.C. No. CIV-94-535-L)

**ORDER AND JUDGMENT**[*]

Before **ANDERSON**, **HENRY,** and **MURPHY**, Circuit Judges.

        This is a diversity case.  The Appellant, Peggy J. Bridges, appeals the

district court's summary judgment holding that Farmers Insurance Company

---

[*]This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata and collateral estoppel.  The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

("Farmers") did not act in bad faith in performing its obligations for underinsured motorist coverage. This court exercises jurisdiction pursuant to 28 U.S.C. § 1291 and affirms.

## I. FACTUAL BACKGROUND

On March 12, 1991, Bridges was a passenger in a vehicle driven by Debbie Inga when the vehicle was struck from behind by another vehicle. At the time of the accident, Bridges had a contract of insurance with Farmers which included medical payments ("med-pay") coverage and underinsured motorist ("UM") coverage. As a result of the accident, Bridges allegedly suffered neck and back injuries, as well as aggravation of a pre-existing epigastric problem. Bridges also claimed lost earnings.

The course of communication between Bridges and Farmers following the accident in 1991 is of primary importance for analyzing Bridges' bad faith claim. On April 4, Bridges' attorney mailed a letter to Farmers, enclosing a collision report and Bridges' medical bills. The letter informed Farmers of the accident, noted that Farmers was Bridges' UM and med-pay insurance carrier, and stated that "there could very well be underinsurance in this case." The letter also stated that Bridges was submitting "medical bills for medical coverage payment at this time."

On April 8, Farmers' representative and Bridges' attorney had a telephone conversation. Farmers and Bridges have differing accounts of what was said in that conversation. Farmers asserts that the attorney indicated that Bridges was making only a med-pay claim. Bridges, on the other hand, asserts that her attorney indicated that she was making a UM as well as a med-pay claim. Bridges cites to the affidavit of her attorney in which he indicates that he "had a phone conversation with a Farmers claims representative in which [he] advised that [Bridges was] making claim for bodily injury under [her] underinsured motorist coverages"; that he was "also asking for payments under . . . medical coverages"; and that he "did not tell the Farmers claims representative that [] Bridges was making claim only under med-pay."

On April 11, Farmers authored a letter to Bridges' attorney. The letter states, "We received notice of a claim involving injury to Peggy Bridges and Debbie Inga. Upon contact, you indicated that West General was handling the claim due to the liability of their insured. If at any time coverage on the tortfeasor is in doubt, or injuries will exceed their limits, please notify Farmers Insurance Company immediately."

On April 18, Bridges' attorney authored a letter to Farmers, submitting "medical bills for payment." The list of medical expenses presented began with the heading, "<u>Peggy J. Bridges</u>: $2,000/each - Medical Pay Coverage." Over the

next two months, Farmers received various documents regarding Bridges' medical treatment and bills. The documents included several notations that insurance limits had been exhausted.

On June 5, Bridges' attorney and a Farmers claims representative again spoke by telephone. Bridges stresses the following portions of the conversation, as recounted in her attorney's affidavit: the attorney advised Farmers that Bridges' claim was "definitely a [UM] claim," as medical bills had already exceeded $ 7,000, while the tortfeasor's West General liability policy was thought to cover only up to $10,000; the attorney informed Farmers that Bridges was having difficulties, including financial difficulties, in obtaining medical treatment; the attorney also attempted to get the Farmers representative to advance portions of the UM coverage, but she refused, instead inquiring about what the tortfeasor's liability carrier was going to do. Bridges' attorney's affidavit also reveals that Farmers' representative "seemed willing to talk but wanted to know what [Bridges'] offer was and what [West General] was going to do; that Farmers' representative "indicated she wanted a total demand and asked [Bridges' attorney] to send her one; that Bridges' attorney told Farmers' representative he did not "have all of the damage information available yet"; and that the representative told the attorney "to send it . . . when [he] got it."

The next contact between Bridges and Farmers did not occur until October 9, 1991, when Bridges' attorney mailed a settlement brochure and a letter making a $45,000 offer, with thirty days to accept or face a lawsuit. The brochure contained various medical documents regarding Bridges' medical history and condition. Farmers claims that the medical records and other documents contained in the brochure demonstrated that "Bridges' alleged injuries were highly suspect, her lost wages claim was inflated, and her $45,000 settlement demand was significantly excessive." Appellee Br. at 3.

Specifically, Farmers points out that Bridges claimed fifty percent of $2,115.50 in medical bills for treatment of an epigastric problem, though she had a long history of stomach problems, including ulcers beginning at age seventeen. Farmers references documents showing that a biopsy taken after the date of the accident revealed that Bridges suffered from a bacterial infection related to her stomach problems, and that she was treated with an antibiotic. Farmers points to Bridges' history of back problems as suggesting that Bridges' claim for medical expenses arising from treatment of her back injury was questionable. Additionally, Farmers refers to documents in the settlement brochure which suggest that Bridges was in fact working during the period she claimed she was unable to work.

On December 23, 1991, Bridges sued Farmers. After the case was removed to federal court, the district court granted Farmers' motion for summary judgment. The court acknowledged there were factual disputes (1) as to whether a UM claim was made in the springtime or not until the October 12 settlement brochure; and (2) as to the amount of Bridges' damages as set forth in the settlement brochure. It held, however, that these factual disputes did not preclude summary judgment because Farmers reasonably withheld payment of UM benefits based upon these legitimate disputes.

The Appellant presents two issues on appeal: "1. Whether the Trial Court erred in finding the existence of a legitimate dispute over the amount of Plaintiff's claim under the circumstances. 2. Whether the Trial Court erred in finding there was a 'legitimate litigable dispute' as to when an underinsured motorist claim was presented." Appellant Br. at 1.

## II. LEGAL STANDARDS AND APPLICATION

This court reviews the district court's grant of summary judgment *de novo*. *See Regional Bank of Colorado v. St. Paul Fire & Marine Ins. Co.*, 35 F.3d 494, 496 (10th Cir. 1994). Summary judgment is appropriate only where the pleadings, admissions, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Regional Bank of Colorado*, 35 F.3d at 496. When applying

the summary judgment standard, the court is to "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Applied Genetics Int'l Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).

The insurer bears an implied duty to deal fairly and to act in good faith toward the insured. *See Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1436 (10th Cir. 1993); *Christian v. American Home Assurance Co.*, 577 P.2d 899, 904 (Okla. 1978). The insurer does not commit bad faith, however, merely by refusing to pay or by litigating a claim, as long as there is a legitimate dispute as to coverage or as to the amount of the claim, and as long as the insurer's position is reasonable. *See Oulds*, 6 F.3d at 1436; *see also Thompson v. Shelter Mut. Ins.*, 875 F.2d 1460, 1462 (10th Cir. 1989). "Until the facts, when construed most favorably against the insurer, have established what might reasonably be perceived as tortious conduct on the part of the insurer, the legal gate to submission of the issue to the jury remains closed." *Oulds*, 6 F.3d at 1437.

As to Bridges' first issue, the trial court did not err in finding the existence of a legitimate dispute over the amount of Bridges' claim under the circumstances. Bridges' settlement brochure raised numerous questions which created a legitimate dispute as to the amount of Bridges' claim. These include questions directed to the origins of Bridges' stomach and back problems, as well

as to the length of time Bridges was actually unable to work. No inference of bad faith arises from such legitimate questions and disputes. *Oulds*, 6 F.3d at 1442.

As to Bridges' second issue, there is a dispute whether Bridges made a UM claim to Farmers before the October settlement brochure, either in April or June. That dispute, however, is not one of material fact. Assuming that such a UM claim was made in April or June, the facts reveal nothing in Farmers' response to such alleged claim from which a reasonable inference of bad faith could be drawn. Instead, the facts, as construed in Bridges' favor, reveal a dialogue between the insurer and the insured regarding the possibility of UM payments, a request by the insurer that the insured inform it of the claim amount, and the eventual presentment of such amount by Bridges in the October settlement brochure. Bridges' suggests this court infer that Farmers was motivated to delay, awaiting a settlement with the tortfeasor's carrier. This suggestion, however, is not a substitute for evidence that Farmers failed to timely and appropriately respond to the actual statements, inquiries, and submissions from Bridges' attorney.

Accordingly, this court **AFFIRMS** the summary judgment.

ENTERED FOR THE COURT,

Michael R. Murphy
Circuit Judge

-8-